UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NISFETA MUJANIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14 CV 1493 JMB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Nisfeta Mujanic ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the Commissioner's final decision denying her applications for

Disability Insurance Benefits, under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.,

and for Supplemental Security Income, under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.

All matters are pending before the undersigned United States Magistrate Judge, with consent of

the parties, pursuant to 28 U.S.C. § 636(c). Because the final decision is supported by

substantial evidence on the record as a whole, it is affirmed.

## I.    PROCEDURAL HISTORY & SUMMARY OF DECISION

On August 24, 2011, Plaintiff filed applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). In her

applications, Plaintiff claimed to have been disabled since June 21, 2011, due to a combination

of physical and mental impairments. Plaintiff's applications were denied and she filed a timely

request for a hearing before an Administrative Law Judge ("ALJ"). On February 13, 2013, the

ALJ conducted a hearing. Plaintiff and a Vocational Expert ("VE") testified at the hearing. On

April 25, 2013, the ALJ issued an unfavorable, written decision, finding that Plaintiff was not under a disability, as defined by the Social Security Act.  (Tr. 6-23)[1]

In denying Plaintiff's claim of disability, the ALJ followed the familiar five-step sequential evaluation process for determining whether Plaintiff was disabled within the meaning of the Act.  (Tr. 10-11)  <u>See</u> 20 C.F.R. §§ 404.1520(a) and 416.920(a).  At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity.  At step two, the ALJ found that Plaintiff suffered from the following severe impairments:  degenerative disc disease of the lumbar spine; obesity; a history of major depressive disorder with psychotic features; cognitive disorders; and headaches.  (Tr. 11)  The ALJ also found that Plaintiff suffered from multiple myalgias which were not severe.

At step three, the ALJ concluded that Plaintiff's physical and mental impairments did not meet or equal the criteria for a listed impairment.  As relevant to the present matter, the ALJ specifically considered Plaintiff's mental impairments, finding that Plaintiff had moderate restrictions in the activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace.  (Tr. 12-13)

Accordingly, the ALJ proceeded to step four.  At step four, the ALJ articulated Plaintiff's residual functional capacity ("RFC").  The ALJ assessed the following RFC:

> [T]he claimant has the residual functional capacity to lift and carry ten pounds frequently and 20 pounds occasionally, sit for at least six hours out of eight, and stand/walk at least six hours out of an eight-hour work day. She can never climb ropes, ladders, or scaffolds. She can occasionally climb stairs and ramps, stoop, kneel, and crouch. She possesses limited reading and writing skills in English. She should avoid concentrated exposure to unprotected heights. She is able to understand, remember, and carry out at least simple instructions and non-detailed tasks. She can respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent.  She can adapt to routine/simple work changes. She should not work in a setting, which includes

---

[1] References to "Tr." are to the administrative record filed by the Commissioner (ECF. No. 6).

constant/regular contact with the general public. She should not perform work which includes more than and frequent handling of customer complaints.

(Tr. 13)

At the administrative hearing, the ALJ posed two hypothetical questions to the VE. The first hypothetical question tracked the stated limitations in the RFC noted above. The second hypothetical question included additional restrictions. In response to both hypothetical questions, the VE testified that such a hypothetical claimant could find work in the national economy. (Tr. 42-45). Plaintiff's counsel posed a third hypothetical question that included a requirement of two extra, fifteen-minute breaks per day to handle emotional issues. The VE testified that such a person would not find employment. (Tr. 45-46)[2]

Plaintiff filed a timely request for review by the Appeals Council. On July 29, 2014, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's April 25, 2013, decision as the final decision of the Commissioner in this matter. (Tr. 1-3) Accordingly, Plaintiff has exhausted her administrative remedies and the matter is properly before this Court.

In her current request for judicial review, Plaintiff asserts that the ALJ's final decision is not supported by substantial evidence on the record as a whole. In her brief to this Court, Plaintiff raises two issues. First, Plaintiff argues that the ALJ erred in failing to give "great weight" to the opinion of Dr. Edwin D. Wolfgram. Second, Plaintiff argues that the ALJ posed an improper hypothetical question to the VE at her hearing in that the question allegedly failed to "encompass any limitation regarding concentration, persistence, or pace." Plaintiff contends that, as a result of either of these errors, the ALJ's decision denying benefits is not supported by

_____

[2] Upon review of the ALJ's written decision, the Court concludes that the ALJ considered the relevant medical and non-medical evidence in the record. Additional aspects of the ALJ's decision are discussed below, in the context of the specific issues raised by Plaintiff in this Court.

substantial evidence, and that decision should be reversed and she should be awarded benefits. (ECF No. 11)

The Commissioner, on the other hand, contends that the ALJ considered all of the evidence and properly discounted Dr. Wolfgram's opinion in view of the inconsistencies with the record. The Commissioner also argues that the ALJ's hypothetical question did, in fact, account for Plaintiff's restricted abilities relative to concentration, persistence, or pace. According to the Commissioner, therefore, substantial evidence in the record supports the Commissioner's denial of benefits. (ECF No. 17)

Having reviewed the record, and in light of controlling legal standards, the Court concludes substantial evidence supports the Commissioner's decision. Contrary to Plaintiff's contention, the ALJ was not required to give "great weight" to Dr. Wolfgram's conclusion that Plaintiff is permanently and totally disabled. Regardless of whether Dr. Wolfgram was a treating physician or consulting physician (or both), the ALJ was not required to give any deference to the specific opinion in question because that opinion embraced the ultimate issue of whether Plaintiff was disabled. See Perkins v. Astrue, 648 F.3d 892, 898 (8th Cir. 2011); 20 C.F.R. § 404.1527(d)(1) . Furthermore, the first hypothetical question posed to the VE accurately reflected Plaintiff's RFC, including limitations accounting for moderate restrictions as to concentration, persistence, or pace. Hence, the ALJ was entitled to rely on the VE's testimony that Plaintiff could return to work as a hotel housekeeper or at the unskilled sedentary level. Therefore, substantial evidence supports the ALJ's decision finding Plaintiff not disabled. See Perkins, 648 F.3d at 902; Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001).

## II.     Summary of Evidence in Record[3]

### A.     General History and Characteristics of Plaintiff

Plaintiff was born in 1970 in Bosnia, and she later moved to the United States, via Germany.  Plaintiff is not a United States citizen.  Plaintiff has a limited education and does not read or write English and lives with her husband in the St. Louis, Missouri, area.  Plaintiff's primary, prior work experience was as a machine operator and as a hotel housekeeper.  Immediately prior to her alleged disability, Plaintiff was working as a hotel housekeeper.  Plaintiff stopped working in June 2011.  Some, but not all, of Plaintiff's physical and mental health problems have been attributed to, or occurred after, a dog bite incident.  More specifically, in August 2007, while working as a hotel housekeeper, Plaintiff opened a door and a dog jumped on her, bit her on the breast, and knocked her down.  Plaintiff received physical and mental health medical treatment after and as a result of that incident.  Plaintiff has not engaged in substantial gainful activity since June 21, 2011, her alleged onset date.

### B.     Relevant Testimony - Administrative Hearing

On February 13, 2013, the ALJ conducted a hearing on Plaintiff's case.  Plaintiff was represented by counsel at the hearing.  Two witnesses testified during the hearing – Plaintiff and a vocational expert.

---

[3] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's decision is supported by substantial evidence.  The recitation of specific evidence in this Memorandum and Order is intended to provide context to the Court's decision.

### 1. *Summary of Plaintiff's Testimony* (Tr. 31-41)

At the time of the hearing, Plaintiff was forty-two years old, with an eighth grade education. During the hearing, Plaintiff frequently testified that she could not remember in response to questions from the ALJ.

In 2000, and from 2003 to 2006, Plaintiff worked as a machine operator at Semco Plastics. In between, from 2000 to 2002, Plaintiff worked at Emerson Electric. In both jobs, Plaintiff worked with machinery, with tasks that included taking pieces/parts out of a manufacturing machine. From 2006 to 2007, Plaintiff worked for O'Brien Corporation, again in connection with machinery. From 2007 until the onset of her alleged disability, Plaintiff worked for Mid-America Hotels Corporation as a housekeeper.

Plaintiff stated that she stopped working as a housekeeper because she "forgot things," and could not remember which rooms to visit, and because she was "in a lot of pain." (Tr. 34) When the ALJ attempted to inquire about the dog bite incident, Plaintiff requested that the ALJ not ask about that matter. Plaintiff gave the ALJ no further specific information regarding the dog bite. Plaintiff's attorney acknowledged, however, that she had a pending worker's compensation claim, as well as a third-party claim.

Plaintiff did not know how tall she was, but stated that she weighed 240 pounds. Plaintiff had seen a psychiatrist, namely Dr. Wolfgram, but stopped seeing him around the time she stopped working. Plaintiff described back problems, including pain and that she could not sit or walk for long periods of time.

In response to questions from her attorney, Plaintiff explained that she cannot read or write in her native Bosnian language or in English. She is right-handed and can lift a gallon of milk. Plaintiff testified that she could stand for eight hours. Plaintiff could not recall when she moved to the United States. Plaintiff lives with her husband and is able to do some cooking and

vacuuming of her living room. Plaintiff testified that she is not able to do laundry because she has difficulty going up and down steps. In particular, she explained that she has pain in her hand, legs, and knees that interferes with her ability to go down steps. Plaintiff also explained that she requires assistance getting into the bath tub, and that she sometimes needs help getting dressed. Plaintiff stated that she forgets things daily and needs someone to tell her what to do, including taking her medication.

Plaintiff testified that she has sleeping problems, including nightmares, which limit her sleep to about two or three hours nightly. Per Plaintiff, her nightmares occur about three or four times per week. Plaintiff stated that she sometimes hears voices or noises that are not present. Plaintiff's attorney inquired briefly about the dog bite incident. Plaintiff stated that the incident was "always in front of my eyes." (Tr. 39) Plaintiff testified that she cries every day. Plaintiff described having pain in her neck and head. She explained that her left arm was usually numb when she woke up in the morning and that the numbness would last until noon or 1:00 p.m. Plaintiff cannot use her arm while it is numb. Near the end of her testimony, and not in response to a specific question, Plaintiff stated that she would be better off if she killed herself.

**2.** ***Summary of Vocational Expert's Testimony*** (Tr. 41-46)

A vocational expert ("VE"), Gerald D. Belchick, Ph.D. (Tr. 98-99), heard Plaintiff's testimony and was given an opportunity to examine the record in the case. Dr. Belchick confirmed that Plaintiff had previously worked as a machine operator and as a hotel housekeeper, and that she lifted 20 pounds or less. Dr. Belchick testified in response to questions posed by the ALJ and Plaintiff's counsel.

The ALJ posed two hypothetical questions to Dr. Belchick. The first hypothetical question asked Dr. Belchick to consider a claimant with the following characteristics and limitations: (1) was forty-one years old with eight years of education and past work as a

machine operator and a hotel housekeeper; (2) could lift and carry twenty pounds occasionally and ten pounds frequently; (3) could stand or walk six out of eight hours and sit for six hours; (4) could occasionally climb stairs and ramps, but never climb ropes, ladders, or scaffolds; (5) could occasionally stoop, kneel, and crouch; (6) should avoid concentrated exposure to unprotected heights; (7) had limited reading and writing skills in English, but was able to understand, remember and carryout at least simple instructions and non-detailed tasks; (8) could respond appropriately to supervisors and co-workers in a task-oriented setting in which contact with other persons was casual and infrequent; (9) could adapt to routine, simple work changes; and (10) would not have constant or regular contact with the general public and would have no more than infrequent handling of customer complaints. (Tr. 41-42)

In response to the first hypothetical question, Dr. Belchick testified that such a claimant could return to work as a cleaner. Dr. Belchick characterized that position as an unskilled job, at the light level. Dr. Belchick further testified that such a claimant could not work as a machine operator, which he indicated was a semi-skilled position that was not simple and repetitive, even if it was performed at a light level. (Tr. 42-43)

The ALJ's second hypothetical question built on the first question, with the following changes: the claimant could lift only ten pounds occasionally, and less than ten pounds frequently; and could only stand or walk two hours out of eight, and sit for six hours. In response to this hypothetical question, Dr. Belchick testified that such a claimant could not work in housekeeping. Dr. Belchick advised, however, that such a claimant could find other work in the national economy in bench packaging and bench assembly. Such work would be considered unskilled and sedentary. (Tr. 43-45)

Plaintiff's counsel also posed a hypothetical question to Dr. Belchick. Counsel asked Dr. Belchick to assume a claimant with the restrictions found in the ALJ's first question, but who

would also require "two additional 15 minute breaks due to emotional issues in addition to the lunch break and the two 15 minute breaks that would normally be given throughout the day." Dr. Belchick testified that the need for the two additional breaks would not be acceptable and that there would be no jobs in the national economy for such a person.  (Tr. 46)

### C.    Relevant Medical Evidence before the ALJ

#### 1.    *General History*

The medical evidence in the record shows that Plaintiff has a history of back and neck pain.  For example, in 2000, 2002, 2004, and 2005, Plaintiff was seen at several local hospitals for neck and back pain.  Plaintiff has not identified any alleged errors regarding the ALJ's assessment of her physical / exertional limitations.  Accordingly, although the Court has reviewed the entire record, more detail is given regarding the record evidence associated with Plaintiff's mental / non-exertional limitations.

#### 2.    *Dr. Heutel – St. John's Mercy Sports & Therapy*

Plaintiff reported that, on August 16, 2007, while she was attempting to clean a room at the Holiday Inn Hotel, a dog jumped on her, bit her left breast, and knocked her down.  In August and September 2007, Plaintiff was seen several times by Dr. Heutel at St. John's Mercy Sports & Therapy.  The focus of these visits was on Plaintiff's physical condition and injuries. Although Plaintiff complained of pain and problems with her spine/back, neck, arm, shoulder, and breast, she was described as "getting better" and assessed to have "good rehab potential." (Tr. 464-74)

#### 3.    *Dr. Sun – St. John's Mercy – South County*

Plaintiff was also seen in August 2007, by Dr. Sun, M.D., at St. John's Mercy – South County, in connection with injuries she sustained in the dog bite incident.  Dr. Sun found that Plaintiff was not in acute distress and that the bite wound appeared healthy, with no sign of

infection.  Dr. Sun reported that Plaintiff suffered a left shoulder contusion and strain, and also referred her to see a personal doctor for headaches.  (Tr. 494-95)

### 4.  *Dr. Ralph – South County Orthopedics*

Between September19, 2007, and October 10, 2007, Plaintiff was seen several times by Michael Ralph, M.D., with South County Orthopedics and Sports Medicine, Inc.  ("South County Orthopedics").  The record indicates that these visits also focused on Plaintiff's physical problems.  For example, on September 19, 2007, Plaintiff complained of left arm, neck and back pain, and indicated that she had been bitten by a dog on her left breast.  Dr. Ralph consulted x-ray and MRI images.  On September 26, 2007, Dr. Ralph reviewed Plaintiff's MRI and noted, among other things, that her range of motion was getting better and that she could return to work, without restriction, on October 1, 2007.  (Tr. 483)  On October 10, 2007, Dr. Ralph found Plaintiff's subjective complaints to be disproportionate to any known anatomic pathways.   Dr. Ralph discharged Plaintiff and advised that, as far as he was concerned, she could return to work. Dr. Ralph concluded that Plaintiff sustained a 1% permanent loss of her left shoulder, and no disability with regard to her neck and back.   (Tr. 482, 486, 488)

### 5.  *Dr. Musich – Independent Medical Evaluations*

Thomas F. Musich, M.D., conducted several independent medical evaluations of Plaintiff between October 2007 and April 2010.  (Tr. 475-78, 500-05)  The record indicates that Dr. Musich assessed Plaintiff's physical impairments.  Dr. Musich's first evaluation focused on injuries Plaintiff sustained while working at Semco Plastics.  Dr. Musich concluded that Plaintiff suffered neck and low back pain in the course of her employment at Semco Plastics, and that her employment with Semco Plastics was "causally related to her persistent complaints referable to the low back and right pelvis which have resulted from symptomatic degenerative disc of the lumbosacral spine, as well as chronic symptomatic right sacroiliac dysfunction and a right

pyriformis syndrome." (Tr. 478) Dr. Musich found no symptomology relative to Plaintiff's cervical spine. Dr. Musich concluded that Plaintiff "suffered a permanent partial disability of 25% …." (Id.)

Dr. Musich evaluated Plaintiff again in February 2008. That evaluation focused on injuries related to the August 2007 dog bite incident. (Tr. 500) Dr. Musich concluded that Plaintiff suffered a permanent, partial disability of 10% due to the puncture wounds. As for Plaintiff's complaints relating to her neck and left shoulder, Dr. Musich opined that Plaintiff's condition had room for improvement with "aggressive formal physical therapy." (Tr. 505) Dr. Musich found no significant pre-existing disability referable to Plaintiff's head, neck, left upper extremity, or left breast before August 16, 2007. (Tr. 500-06)

On April 19, 2010, Dr. Musich conducted his third evaluation of Plaintiff. During this evaluation, Plaintiff indicated she had not suffered any trauma since August 16, 2007, and she continued to work 40 hours per week, without restrictions, as a hotel housekeeper. Plaintiff also reported that, since February 2008, she had not received any further treatment for her trauma of August 16, 2007. (Tr. 554-58) Dr. Musich concluded that Plaintiff suffered a 10% permanent partial disability of the person as a whole "secondary to [the] dog bite on the left breast" and "a permanent partial disability of 30% of the upper extremity at the shoulder level due to … work trauma." (Tr. 557)

### *6.* *Dr. Stromberg – Independent Medical Evaluation*

On October 11, 2007, Plaintiff was evaluated by Brent Stromberg, M.D., in reference to her dog bite injury. Dr. Stromberg concluded that Plaintiff could return to work on October 15, 2007, with a lifting restriction, and to full duty two weeks after that. (Tr. 496-97)

### 7.    *Dr. Wolfgram –Psychiatric Medical Evaluations*

On July 21, 2008, Plaintiff was referred to Edwin Wolfgram, M.D., for an independent psychiatric medical exam.  Dr. Wolfgram assessed Plaintiff's condition both before and after the August 16, 2007, dog bite injury.  Regarding Plaintiff's condition after August 2007, Dr. Wolfgram diagnosed Plaintiff under Axis I as follows:  (1) Pain Disorder Associated with Both Psychological Factors and a General Medical Condition, representing a permanent partial psychiatric disability of 10%; (2) Mood Disorder Due to a Cerebral Concussion, representing a permanent partial psychiatric disability of 20%; and (3) Posttraumatic Stress Disorder, Chronic, with a permanent partial psychiatric disability of 25%.  (Tr. 513-14)  Dr. Wolfgram commented that these disabilities are "synergistic in their effect …, resulting in a disability greater than their individual parts."  (Tr. 514)  Dr. Wolfgram further opined that Plaintiff was "permanently and totally psychiatrically disabled."  (Id.)  Dr. Wolfgram noted that Plaintiff's "present employment is in a protective setting that has been arranged for her.  Such a protected setting cannot be arranged outside her current employment."  (Tr. 513-14)  Under Axis V, Dr. Wolfgram assessed a Global Assessment of Function ("GAF")[4] of 38, with severe impairment of "mood, work capacities, and ability to maintain effective interpersonal relationships."  (Tr. 515)

The record indicates that Dr. Wolfgram provided two notes to Plaintiff's employer.  In a handwritten note, dated April 20, 2010, Dr. Wolfgram advised that "[Plaintiff] continues to have left breast and shoulder pain.  She has headaches, pains from back of head to left back into the

_____

[4] The Global Assessment of Functioning Scale ("GAF") is a psychological assessment tool wherein an examiner considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), 32 (4th ed. 1994).  A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  Id. at Text Revision 34 (4th ed. 2000) (DSM-IV-TR).  A GAF score between 41 to 50 indicates "serious symptoms" or any serious impairment in social, occupational, or school functioning (e.g., no

left leg and foot …. Recommend to work on first floor room[;] no work in second floor rooms. No work in laundry." (Tr. 572) In a letter dated May 27, 2011, Dr. Wolfgram stated that Plaintiff was evaluated on May 26, 2011. The letter further stated that, "Due to medical reasons, Ms. Mujanic was advised to discontinue her employment by June 12, 2011." (Tr. 559)

On June 24, 2011, Dr. Wolfgram issued an "Addendum Report" to his July 21, 2008, report. In this report, Dr. Wolfgram indicated that he began treating Plaintiff on February 26, 2010.[5] The a substantial portion of Dr. Wolfgram's Addendum Report was devoted to critiquing the evaluations and conclusions of Drs. Doll, Musich, and Stillings.[6] Dr. Wolfgram continued to support his prior findings from his independent medical exam, which was conducted before he began treating Plaintiff.

As part of his June 24, 2011 report, Dr. Wolfgram summarized Plaintiff's work performance review history at the Holiday Inn. According to Dr. Wolfgram's summary, in July 2007, immediately before the dog bite incident, all of Plaintiff's scores "exceeded" or "significantly exceeded" expectations. Plaintiff's April 2008 scores improved slightly in that the number of scores that significantly exceeded expectations increased. Plaintiff's April 2009 scores showed a slight decrease from her July 2007 scores, and included two categories indicating that her work "meets expectations." Plaintiff's April 2010 scores showed a significant shift. While the majority of Plaintiff's April 2010 scores showed that she was meeting expectations, she had only two instances of consistently exceeding expectations and no marks in the significantly exceeding expectations category. Although there is no indication in Dr.

---

friends, unable to keep a job)."
[5] The record includes some handwritten notes relative to meeting with Plaintiff, as well as her family and co-workers.
[6] For example, Dr. Wolfgram referred to Dr. Stillings' approach as having "no merit and is like painting by the numbers." (Tr. 566)

Wolfgram's summary that Plaintiff's performance ever fell below expectations, she did receive two warnings in 2010.  (Tr. 563)

Dr. Wolfgram concluded that Plaintiff's continued employment was "health threatening," and that she had "become a pawn in the management of the litigation process."  (Tr. 568)  Dr. Wolfgram opined that Plaintiff required treatment that would "not be curative but [would] make life sustainable."  (Tr. 569)  Finally, Dr. Wolfgram noted that Plaintiff continued her employment out of a "desperate need for money."  (Id.)

### 8.  *Dr. Stillings – Independent Psychiatric Medical Evaluation*

On November 18, 2009, Plaintiff received an independent psychiatric evaluation from Wayne Stillings, M.D., Assistant Professor of Clinical Psychiatry, Washington University School of Medicine.  (Tr. 516-28)  Dr. Stillings found Plaintiff to be both alert and cooperative, and that her "thoughts were logical and coherent."  (Tr. 524)  Dr. Stillings administered several tests, including the MMPI-2, MCMI-III, and SIMS.  These tests indicated, among other things, that Plaintiff exaggerated or over-reported some of her symptoms and subjective complaints.  Dr. Stillings' provided the following psychiatric diagnosis:

> AXIS I:  Adjustment Disorder, unspecific, in remission.
>
> AXIS II:  Personality Disorder, NOS, with depressive, dependent, passive-aggressive, borderline, and schizoid personality traits with elements of exaggeration, pre-existing (defined as prior to 08/16/2007).
>
> AXIS III:  Per medical records and including chronic pain due to DDD of the cervical and lumbar spines, pre-existing.
>
> AXIS IV:  Poor English language skills, separated from her nuclear family in Bosnia, and interaction with the legal system.
>
> AXIS V:  GAF = 70-75 (very mild to no significant psychiatric symptoms/functioning pretty well from an emotional standpoint).

(Tr. 527-28)  Dr. Stillings opined that Plaintiff was able to continue working without restrictions. Dr. Stillings also opined that Plaintiff suffered from an "adjustment disorder," resulting in a 1-

2% permanent partial psychiatric disability due to the August 2007 dog bite incident, and "maladaptive personality traits," resulting in a 2% permanent partial psychiatric disability due to her pre-existing conditions. (Tr. 528)

On March 20, 2012, Dr. Stillings conducted a review of additional information, including information from Drs. Doll, Musich, and Wolfgram. Dr. Stillings concluded that his prior diagnoses and opinions were unchanged by the additional information. (Tr. 570-71)

### 9. *Dr. Doll – Independent Medical Evaluations*

James Doll, D.O., conducted independent medical examinations of Plaintiff on May 28, 2008, and December 1, 2009. Dr. Doll's first examination focused on an alleged work-place injury associated with Plaintiff's work at Semco Plastics, and his second examination focused on Plaintiff's condition after the August 2007 dog bite incident. In his May 28, 2008 report, Dr. Doll concluded that Plaintiff had a 3% permanent partial disability of her cervical spine, and a 3% permanent partial disability of her lumbar spine, both attributable to a pre-existing degenerative condition. (Tr. 543-51) In his December 1, 2009 report, Dr. Doll concluded that Plaintiff was at "maximum medical improvement" relative to the August 2007 injuries. Dr. Doll concluded that Plaintiff had sustained no permanent partial disabilities attributable to the dog bite injuries. (Tr. 529-34)

### 10. *Dr. Moses-Nunley – Psychological Consultative Examination*

On November 10, 2011, Diana Moses-Nunley, Ph.D., licensed psychologist, performed a psychological consultative exam of Plaintiff. Dr. Moses-Nunley examined Plaintiff for 60 minutes, and also referred to an adult function report prepared by "someone else." Regarding Axis I, Dr. Moses-Nunley diagnosed Plaintiff with "Major Depressive Disorder, Single Episode, Severe Psychotic Features," and "Cognitive Disorder NOS." (Tr. 250) On Axis V, Dr. Moses-Nunley assigned a GAF score of 50. Dr. Moses-Nunley concluded that Plaintiff had a fair

prognosis, and that she would benefit from "consistent psychotherapeutic interventions in her language as well as ongoing pharmaceutical treatment with a psychiatrist to address her depression and anxiety." (Tr. 246-50)

### 11.    *Dr. Mendoza – Internal Medicine Consultative Examination*

On November 10, 2011, Loretta Mendoza, M.D., performed a physical consultative exam on Plaintiff. Dr. Mendoza spent an hour examining Plaintiff and indicated that no prior medical information had been provided to her. Plaintiff's chief complaint during this examination was pain all over. Upon examining Plaintiff, Dr. Mendoza's clinical impressions were that Plaintiff suffers from degenerative disc disease of the lumbar spine, and a cervical strain, probably with some tendonitis in her left shoulder. (Tr. 253- 57) X-rays taken on November 10, 2011, confirmed the impression of degenerative disc disease of the lumbar spine. (Tr. 258)

### 12.    *People's Health Center – Treating Examinations*

Between November 2011 and July 2012, Plaintiff was treated several times by Dr. Tyler Mork, D.O., at the People's Health Center ("People's"). (Tr. 240-43, 592-613) Records from those visits indicate that Plaintiff was seen primarily for problems related to depression, headaches, and body aches. On November 1, 2011, Plaintiff presented at People's with a headache, body pains, and feelings of depression. Plaintiff was diagnosed with mild depression. No anxiety or other psychiatric symptoms were noted, including memory impairment. Plaintiff was found to be oriented to time, place, person, and situation, and had normal insight and judgment. (Tr. 590) Plaintiff was prescribed Naproxen for pain and Sertraline for her depression. (Tr. 591)

Plaintiff again presented at People's on November 29, 2011. In this visit, Plaintiff complained that her medication was not helping with her headaches. Plaintiff's diagnoses included anxiety, depression, headache, and insomnia. Plaintiff's dosage of Sertraline was

increased, and she was advised to return in three months, and her headache medication was changed.  (Tr. 593-95)

Plaintiff next visited People's on December 28, 2011, for a "follow-up."  Plaintiff reported no improvement relative to her headaches and pain.  Her diagnoses again included anxiety and depression.  Plaintiff's dosage of Sertraline was increased.  Plaintiff was advised that her pain was tied to her depression and she needed to see a psychiatrist.  The treatment notes indicate that Plaintiff had failed to contact the referral when advised to do so.  (Tr. 597-99)

Plaintiff visited People's on January 26, 2012, complaining of pain in multiple locations and headaches, and that she still felt depressed.  Regarding her depression, Plaintiff was continued on her prior dosage plan for Sertraline. The treatment notes state, "As we have discussed before on multiple occasions, I feel you would benefit from talking to a psychiatrist…. I feel your depression is intimately related to your pain and controlling the depression will help you from that standpoint as well."  (Tr. 603)  Lyrica was added to Plaintiff's medications.  (Tr. 601-03)

Plaintiff again presented at People's on April 20, 2012.  Plaintiff complained of constant headaches, pain all over her body, and that her depression was poorly controlled by the medications.  Plaintiff was directed to stop using Sertraline for her depression and to look into two different alternatives, depending upon her ability to pay.  According to the treatment notes, Plaintiff was directed to try Duloxetine, if she could afford it.  If not, Plaintiff was to use Paroxetine.  Plaintiff was also directed to make an appointment with a social worker to discuss seeing a psychiatrist to help with her depression.  (Tr. 606-08)

On May 3, 2012, People's sent Plaintiff a reminder that she should see a neurologist.  On July 20, 2012, People's sent Plaintiff a note that she had failed to keep her last appointment.  Plaintiff's final visit at People's, as reflected in the record, was on July 27, 2012.  The notes

indicate that Plaintiff had seen a neurologist and was taking medication for headaches, but it was not helping her. Plaintiff was continued on Paroxetine for her depression. Plaintiff was reminded that People's had social workers available that might help her with her depression symptoms. (Tr. 611-13)

As noted by the ALJ, there is no indication that Plaintiff ever followed Dr. Mork's advice to see a psychiatrist or a social worker relative to her depression symptoms. (Tr. 19)

### D. Other Record Evidence

#### 1. *Vocational Rehabilitation Evaluation*

The record includes a "Report of Vocational Rehabilitation Evaluation," by Vincent Stock, a vocational rehabilitation counselor and a licensed psychologist. The matter was referred to Mr. Stock by Plaintiff's attorney in order to assist in a worker's compensation claim. (Tr. 201) Mr. Stock examined Plaintiff for a little more than one hour on December 14, 2011. Mr. Stock also reviewed a variety of medical records and reports. (Tr. 204) Mr. Stock concluded that Plaintiff had an "extreme limitation" with respect to the activities of daily living, and "marked limitations" with respect to social functioning, and concentration, persistence, and pace. (Tr. 210) Mr. Stock's recitation of Plaintiff's specific functional limitations does not refer back to any of the medical evidence. Rather, these limitations follow descriptions of Plaintiff's own description of her activities. (Id.)

Mr. Stock concluded that Plaintiff "ha[d] significant limitations that impact her ability to work that include the combination of her physical limitations and mental limitations and make her permanently and totally disabled from working." (Tr. 211)

#### 2. *Geraldine Boeger and Sherry Bassi, Ph.D. - Physical and Mental RFC Assessments*

After the psychological and physical evaluations of Drs. Moses-Nunley and Mendoza (supra), Geraldine Boeger and Sherry Bassi, Ph.D., completed physical and mental RFC

assessments of Plaintiff.  These assessments appear to form the basis for the RFC found and used by the ALJ in deciding Plaintiff's case.

On November 21, 2011, Geraldine Boeger completed a physical RFC assessment for Plaintiff.  According to this RFC, Plaintiff was capable of the following:  (1) could lift/carry twenty pounds occasionally and ten pounds frequently; (2) could stand and/or walk for six hours in an eight-hour workday; (3) could sit for six hours in an eight-hour workday; (4) had unlimited ability to push and/or pull (other than as limited by the lift/carry restrictions); (5) had no postural limitations; (6) had no manipulative limitations; (7) had no visual limitations; and (8) had no environmental limitations.  (Tr. 262-67)[7]

On November 22, 2011, Dr. Bassi completed a mental residual functional capacity assessment and psychiatric review.  (Tr. 268-82)  Dr. Bassi concluded that Plaintiff was moderately limited in five of the twenty areas evaluated and not limited in the other areas.  In particular, Dr. Bassi found Plaintiff to be moderately limited in her abilities to:  (1) understand and remember detailed instructions; (2) maintain attention and concentration for extended time periods; (3) sustain an ordinary routine without special supervision; (4) complete a normal workday / workweek without interruption from psychologically based symptoms; and (5) perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 268-69)

Dr. Bassi found that Plaintiff was not significantly limited with respect to the following most of the abilities evaluated, including Plaintiff's ability:  (1) to remember locations and work-like procedures; (2) to understand and remember very short and simple instructions; (3) to perform activities within a schedule, maintain regular attendance, and be punctual within

_____

[7] Ms. Boeger's assessment was, at a minimum, consistent with the ALJ's RFC finding (Tr. 13).  The ALJ's RFC was arguably more restrictive due to the inclusion of limitations based

customary tolerances; and (4) work in coordination with or proximity to others without being distracted. Dr. Bassi found that Plaintiff had no significant limitations with respect to any abilities associated with social interaction or adaptation.[8] (Tr. 268-69)

## III.  APPLICABLE LAW & STANDARD OF REVIEW

To be eligible for DIB and SSI under the Social Security Act, a plaintiff must prove that she is disabled.  See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a plaintiff is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  At step one, the Commissioner considers whether a claimant is engaged in substantial gainful activity.  If so, disability benefits are denied.  At step two, the Commissioner decides whether the claimant has a "severe" medically determinable impairment, or combination of impairments, which significantly limits her ability to do basic work activities.  If the claimant's impairment is not severe, then she is not disabled.  If the impairment is severe, the Commissioner

_____

on Plaintiff's severe mental impairments.
    [8] These abilities include, for example, the ability to accept instructions and respond

then determines at step three whether such impairment meets or is equivalent to one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If a claimant's impairment meets or equals one of the listed impairments, she is conclusively disabled. At step four, the Commissioner establishes whether the claimant's impairment prevents her from performing her past relevant work. If the claimant can perform such work, she is not disabled. Finally, if the claimant is unable to perform her past work, the Commissioner continues to step five and evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. The claimant is entitled to disability benefits only if she is not able to perform other work.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial Evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Myers v. Colvin, 721 F.3d 521, 524 (8th Cir. 2013) (internal quotations omitted). The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotations omitted). "Substantial evidence on the record as a whole … requires a more scrutinizing analysis." Id. (internal quotations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The [plaintiff's] vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The [plaintiff's] subjective complaints relating to exertional and non-exertional activities and impairments.

appropriately to changes in a work setting. (Tr. 269)

5.      Any corroboration by third parties of the [plaintiff's] impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the [plaintiff's] impairment.

<u>Stewart v. Sec'y of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court also must consider any evidence which fairly detracts from the Commissioner's decision.  <u>See</u> <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).  "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions," the Commissioner's decision must be affirmed.  <u>Anderson v. Astrue</u>, 696 F.3d 790, 793 (8th Cir. 2012).  The decision may not be reversed merely because substantial evidence also could support a contrary outcome.  <u>See</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000).

## IV.    <u>ANALYSIS OF ISSUES PRESENTED</u>

In her brief in support of her complaint (ECF No. 11), Plaintiff raises two issues for this Court's consideration.  First, Plaintiff argues that the ALJ was required to give "'great weight' to the opinion of Dr. Wolfgram that [Plaintiff] is permanently and totally disabled, and that Dr. Wolfgram recommended [that Plaintiff] stop working to prevent further decline in her mental state."  (ECF No. 11 at 18)  Second, Plaintiff argues that the ALJ's hypothetical question posed to the VE failed to encompass the fact that Plaintiff had "moderate difficulties with concentration, persistence or pace."  (<u>Id.</u> at 19)

There does not appear to be any dispute as to the ALJ's determination of Plaintiff's physical/exertional limitations.  Further, Plaintiff does not take issue with: (1) any aspects of the ALJ's hypothetical questions, apart from the alleged failure to include restrictions directed concentration, persistence or pace; (2) any specific aspect of the ALJ's determination and articulation of Plaintiff's residual functional capacity ("RFC"), and (3) the ALJ's adverse

credibility determinations, including the ALJ's adverse credibility findings relative to Plaintiff and vocational rehabilitation counselor Vincent Stock.[9]  With the foregoing considerations in mind, the Court will address each of the errors raised by Plaintiff.

### A.    Dr. Wolfgram's Opinion

Plaintiff contends that the ALJ was required to give great weight to Dr. Wolfgram's opinion that Plaintiff was "permanently and totally disabled."  Plaintiff further contends that the ALJ erred in failing to consider Dr. Wolfgram's opinion as that of a "treating physician."  As explained below, regardless of whether Dr. Wolfgram is viewed as a treating physician or otherwise, the ALJ did not err in declining to give great weight to Dr. Wolfgram's opinion.

It is well-established that the ALJ need not give any deference to a treating physician's opinion that a claimant is disabled or can no longer be gainfully employed.  See Perkins v. Astrue, 648 F.3d 891, 897 (8th Cir. 2011); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).  Such an opinion "invades the province of the Commissioner to make the ultimate disability determination."  House, 500 F.3d at 745 (internal quotations omitted).  Under this standard, the ALJ was justified in not giving "great weight" to Dr. Wolfgram's opinion that Plaintiff was disabled.  The Court's conclusion in this regard does not hinge on whether Dr. Wolfgram is considered a treating physician because Perkins and House make clear that even a treating

---

[9] The Court notes that, in making a credibility finding relative to the Plaintiff, the ALJ complied with the requirements of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  See also 20 C.F.R. §§ 404.1529, 416.929; Partee v. Astrue, 638 F.3d at 860, 865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a [plaintiff's] subjective complaints") (internal quotations); Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the ALJ's decision to include a discussion of how every Polaski factor relates to the [plaintiff's] credibility").  Regarding Vincent Stock, as Plaintiff has not relied on any aspect of Stock's report in her argument, the Court need not pass on the ALJ's adverse credibility assessment of him in resolving this matter.

physician's opinion on the ultimate issue of disability is entitled to no deference.  <u>See also</u> 20 C.F.R. § 404.1527(d)(1).  Accordingly, Plaintiff's first issue cannot be sustained.

Moreover, as the ALJ correctly noted, Dr. Wolfgram's opinion on the ultimate issue of disability was based on vocational and other non-medical / non-psychiatric factors.  (Tr. 19)  For example, Dr. Wolfgram opined that Plaintiff had become a "pawn in the management of the litigation process."  (Tr. 568)  Dr. Wolfgram's opinion also rests assumptions that are not supported by the record.  Specifically, Dr. Wolfgram stated that Plaintiff's employment was "in a protective setting that ha[d] been arranged for her.  Such a protected setting cannot be arranged outside her current employment."  (Tr. 514)  Dr. Wolfgram also stated that Plaintiff was "employable until the event of August 16, 2007.  After the event she was no longer employable." (<u>Id.</u>)  The ALJ was not required to give any deference to Dr. Wolfgram's opinion that Plaintiff could not find other work outside of her current employment.

Other than the ultimate issue of disability, Plaintiff has not identified any other opinions or diagnoses in Dr. Wolfgram's reports that the ALJ did not properly address or factor into his analysis.  Rather, Plaintiff argues that the diagnosis of a consulting psychologist, Dr. Moses-Nunley, corroborates Dr. Wolfgram's opinion that Plaintiff is totally disabled.  This argument, however, misses the point.  Dr. Wolfgram's opinion on the ultimate issue of disability was entitled to no deference, regardless of whether that opinion was corroborated.

Even if Plaintiff had identified specific medical/psychiatric aspects of Dr. Wolfgram's report, the ALJ would still have been justified in giving such opinions less than "great weight."  First, in this regard, the Dr. Wolfgram's diagnoses and opinions were, for the most part, contained in his initial report.  At the time of Dr. Wolfgram's initial report in 2008, he was not

treating Plaintiff.[10]  Dr. Wolfgram's second report, dated June 24, 2011, re-affirmed his prior

conclusions.[11]  The primary focus of the second report was Dr. Wolfgram's criticisms and

rebuttal of contradictory evidence in the record.

Additionally, the ALJ was also justified in discounting Dr. Wolfgram's opinions and

diagnoses because they were inconsistent with the record as a whole.  One of the ALJ's primary

functions is to resolve conflicts among the opinions of treating and examining physicians.  See

Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007) (citing Pearsall v. Massanari, 274 F.3d

1211, 1219 (8th Cir. 2001)).  An ALJ may reject conclusions from a medical expert if they are

inconsistent with the record as a whole.  Id.  Likewise, "[a]n ALJ may discount or even disregard

the opinion of a treating physician where other medical assessments are supported by better or

more thorough medical evidence, or where the treating physician renders inconsistent opinions

that undermine the credibility of such opinions."  Perkins, 648 F.3d at 897-98 (internal

quotations omitted).

In the present case, there is substantial evidence in the record that contradicts Dr.

Wolfgram.  First, Dr. Wolfgram's own opinions appear to be internally inconsistent.  It is not

disputed that Plaintiff continued to work for nearly four years after the date on which Dr.

Wolfgram claims she was disabled.  Despite this fact, in April 2010, Dr. Wolfgram wrote a letter

to Plaintiff's employer requesting workplace accommodations (i.e., first floor work and no

laundry), but he did not recommend that she stop working.  (Tr. 572)  In fact, Dr. Wolfgram's

---

[10] Dr. Wolfgram stated that he commenced treating Plaintiff on February 26, 2010.  (Tr. 560)

[11] "I continue to support the positions developed in the [July 21, 2008] report.  At that early date …, I indicated that [Plaintiff] is permanently and totally psychiatrically disabled.  In addition, 'Her present employment is in a protective setting that has been arranged for her.  Such a protected setting cannot be arranged outside her current employment.'  There was no room for subsequent evaluations to conclude that [Plaintiff's] continued employment was a reflection of her healthfulness." (Tr. 561)

April 2010 letter referenced only physical accommodations, no mental or psychological matters were articulated.  (Id.)  It was not until June 2011 that Dr. Wolfgram recommended that Plaintiff stop working.  (Tr. 559)  Moreover, according to Dr. Wolfgram's own analysis of Plaintiff's performance evaluations, she always scored at or above the minimal level of expectations.  (Tr. 563)

Second, as noted above, Dr. Wolfgram's opinions appear to be based, at least in substantial part, on factors other than medical evidence.  Dr. Wolfgram concluded that Plaintiff had "become a pawn in the management of the litigation process."  (Tr. 568)  Dr. Wolfgram also opined that Plaintiff's "present employment [was] in a protective setting that has been arranged for her.  Such a protective setting cannot be arranged outside her current employment."  (Tr. 514)

There was additional record evidence in conflict with Dr. Wolfgram's opinions.  Psychiatrist Dr. Stillings examined Plaintiff in November 2009, more than a year after Dr. Wolfgram's report.  Dr. Stillings reviewed available medical records, including information from Dr. Wolfgram.  Dr. Stillings administered three standard tests, which indicated, among other things, that Plaintiff tended to exaggerate and over-report some of her symptoms and subjective complaints.  (Tr. 525-27)  Nonetheless, Dr. Stillings found Plaintiff to suffer from several psychiatric-related problems.  (Tr. 527-28)  Dr. Stillings concluded, however, that Plaintiff did not suffer from post-traumatic stress disorder relative to the dog bite incident.  (Tr. 528)  In March 2012, Dr. Stillings reviewed additional records, including those of Dr. Wolfgram, and concluded that his prior "diagnoses and opinions remained unchanged."  (Tr. 570-71)

Although Dr. Moses-Nunley opined that her evaluation of Plaintiff suggested "moderate to marked impairment" with respect to Plaintiff's ability to perform work-related activities (Tr. 250), that opinion was not differentiated among particular types of activities or tasks such that the ALJ could incorporate the limitations into his analysis.  Dr. Bassi, on the other hand,

completed a mental RFC and psychiatric review and found no indication of any marked limitations, and only five of the twenty abilities analyzed indicated any moderate limitations. Dr. Bassi specifically found that Plaintiff was not limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

Finally, after Dr. Wolfgram directed Plaintiff to stop working, she no longer pursued psychological counselling from Dr. Wolfgram, even after Dr. Mork at People's advised her multiple times that she would benefit from such psychological counseling.

In summary, the ALJ did not err in declining to give "great weight" to Dr. Wolfgram's opinion that Plaintiff was permanently and totally disabled. Furthermore, Dr. Wolfgram's opinions were inconsistent with the record as a whole, including the fact that Plaintiff continued to work for nearly four years after the date on which Dr. Wolfgram opined that she was no longer employable.

**B.** **Hypothetical Questions Posed to VE**

Plaintiff also argues that the ALJ's hypothetical question posed to the VE failed to encompass the fact that Plaintiff had "moderate difficulties with concentration, persistence or pace." (Id. at 19) The Court concludes that the ALJ's first and second hypothetical questions did, in fact, encompass conditions consistent with a person who has moderate difficulties with concentration, persistence, or pace.

At step four of the process, the ALJ determines whether a claimant is capable of performing her past relevant work. In this case, the ALJ first determined Plaintiff's RFC. The ALJ then then posed a hypothetical question to the VE that encompassed the Plaintiff's age, education, work experience, and limitations of her RFC as determined. In particular, the ALJ first asked the VE to consider a hypothetical claimant with the age, education, and work experience of the Plaintiff. The ALJ asked the VE to assume that the hypothetical claimant

could also:  (1) lift and carry twenty pounds occasionally, and ten pound frequently; (2) stand or walk for six out of eight hours; (3) occasionally climb stairs and ramps, but never climb ropes, ladders, or scaffolds; (4) occasionally stoop, kneel, and crouch; (5) avoid concentrated exposure to unprotected heights; (6) have limited reading and writing skills in English, and is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; (7) can respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; (8) can adapt to routine, simple work changes; (9) should not work in a setting which includes constant and regular contact with the general public and should not perform work which includes handling customer complaints.  (Tr. 41-42)

In response to this first hypothetical question, the VE testified that such a claimant could perform her past relevant work as a hotel housekeeper, which is considered semi-skilled and light work.  (Tr. 42-43)  The VE clearly understood these limitations because he also testified that Plaintiff could not return to her past work as a machine operator.  (Tr. 42-43)  The VE explained that, even though a machine operator might be performed at a light level (i.e., taking into account Plaintiff's physical/exertional limitations), it was not "simple and repetitive enough" (i.e., taking into account Plaintiff's mental/non-exertional limitations).  (Tr. 43)

For a second hypothetical, the ALJ asked the VE to consider the same hypothetical claimant as before, except this claimant would be limited to lifting only ten pounds occasionally, and less than ten pounds frequently.  Further, the second hypothetical claimant could only stand or walk for two hours out of eight, and would sit for six hours out of eight.  (Tr. 43)

In response to the second hypothetical question, the VE testified that such a claimant would not be able to perform her past relevant work as a hotel housekeeper, but could find other substantial work in the national economy.  Such work would be unskilled and light, including bench packaging and assembly.  (Tr. 44-45)

Plaintiff's attorney posed a third hypothetical to the VE. The third hypothetical asked the VE to consider the same hypothetical claimant as described in the first question, but to include a requirement of two additional fifteen minute breaks "due to emotional issues in addition to the lunch break and the two 15 minute breaks that would normally be given throughout the day." (Tr. 46) The VE testified that those additional limitations would be unacceptable. (Id.) Thus, such a person would be unemployable.

Plaintiff argues that the first (and presumably second) hypothetical questions failed to encompass "any limitation[s]" regarding concentration, persistence, or pace. (ECF No. 11 at 19) Plaintiff further contends that, when the VE was asked a question that did include "moderate difficulties" with concentration, persistence, or pace, the ALJ found there were no jobs available. (Id.) As explained below, the Court finds Plaintiff's argument unpersuasive.

It is not disputed that the ALJ found Plaintiff to have moderate limitations relative to concentration, persistence, or pace. Plaintiff has not argued that this finding was erroneous or not supported by substantial evidence. Rather, Plaintiff's second argument appears to accept this finding as correct. Therefore, in order to resolve Plaintiff's second issue, the Court must determine if the first hypothetical question involved any limitations relating to moderate limitations in concentration, persistence, or pace.

To meet the Commissioner's burden, a VE may be used by the ALJ. An ALJ posing a hypothetical question to the VE is not required to include all of plaintiff's alleged limitations. Rather, "the ALJ exclude any impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." Perkins v. Astrue, 648 F.3d 892, 902 (8th Cir. 2011) (internal quotations omitted). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true…. The hypothetical question must capture the concrete consequences of the claimant's deficiencies."

Id. at 901-02 (internal quotations omitted). The hypothetical, however, "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (internal quotations omitted).

The first hypothetical question posed to the VE tracked the ALJ's assessment of Plaintiff's RFC. (Tr. 13) In making that determination, the ALJ specifically considered Plaintiff's moderate difficulties with concentration, persistence, or pace. (Tr. 12-13) In articulating more detailed limitations for his RFC assessment, the ALJ considered the regulations. (Tr. 13) Plaintiff does not argue that the ALJ erred in his consideration. Upon review of the record, the Court concludes that, contrary to Plaintiff's argument, the RFC determined by the ALJ and used to form the first and second hypothetical questions did, in fact, include limitations regarding concentration, persistence, and time.

In her argument, Plaintiff does not attempt to address or distinguish the non-exertional limitations that the ALJ did include, namely person who had the following limitations: only able to understand, remember, and carry out simple instructions and non-detailed tasks; could respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent; could adapt to only routine/simple work changes; could not work in a setting that included constant and regular contact with the general public and could not handle customer complaints. See also SSR 96-8P, 1996 WL 374184 (explaining that "RFC is not the least an individual can do despite his or her limitations or restrictions, but the most") (emphasis in original).

The Court finds that the ALJ's proffered non-exertional limitations are consistent with moderate difficulties regarding concentration, persistence, or pace. See Howard, 255 F.3d at 581-82 (finding that that hypothetical with a limitation of "simple, routine, repetitive work" was

sufficient where claimant had "deficiencies of concentration, persistence or pace"); <u>Garrett v. Colvin</u>, 2013 WL 3984575 at *4 (D.Neb. Aug. 2, 2013). The ALJ's hypothetical in this case included more limitations relative to concentration, persistence or pace, than the hypothetical approved in <u>Howard</u>. Moreover, the VE clearly understood and considered that the non-exertional limitations of simple and repetitive work in rendering his opinion.

The only difference between the first hypothetical and Plaintiff's hypothetical was the requirement of two extra fifteen minute breaks to accommodate emotional issues. Plaintiff does not point to any substantial evidence in the record that would support the requirement of two extra fifteen minute breaks for emotional issues in connection with <u>moderate</u> limitations in concentration, persistence, or pace. Plaintiff's proffered limitations were to be considered <u>in addition to</u> the already-included limitations of simple instructions, non-detailed tasks, a task-oriented setting, simple work changes, and limited contact with others.

Accordingly, Plaintiff's contention that the ALJ's hypothetical question was improper cannot be sustained. Hence, the ALJ did not err in finding that Plaintiff was not disabled. <u>See Howard</u>, 255 F.3d at 582 ("Testimony from a vocational expert based on a properly-phrased hypothetical constitutes substantial evidence.") (citing <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996)).

**VII.    <u>CONCLUSION</u>**

Therefore, for all of the foregoing reasons, the Court concludes that the Commissioner's adverse decision is based upon substantial evidence on the record as a whole and the decision of the Commissioner should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this ____28th____ day of May, 2015.


/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE